UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
Tampa Division

MIKE HAINSWORTH and
TERRIE HAINSWORTH,

      Plaintiffs,

v.                                                      Case No.
                                                           Jury Trial Demanded

POWERSKI INTERNATIONAL, INC.
and ROBERT MONTGOMERY,

      Defendants.
_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, Mike Hainsworth and Terrie Hainsworth, sue Defendants, Powerski International, Inc. and Robert Montgomery, demand trial by jury of all issues so triable, and allege:

**Jurisdiction and Venue**

1. This action arises under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

2. This Court has jurisdiction over this subject matter pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

3. In the alternative, this Court has jurisdiction pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as the Defendants transact business in this Judicial District. *See* 15

U.S.C. § 78aa.

## Parties

5.  Plaintiffs, Mike Hainsworth and Terrie Hainsworth are husband and wife and residents of Tampa, Florida.

6.  Powerski International, Inc. ("Powerski") is a California corporation with its principal place of business in San Clemente, California. Powerski was incorporated in 1995 for the purpose of developing and marketing a unique lightweight stand up type single rider watercraft resembling a power driven surfboard.

7.  Defendant Robert Montgomery, upon information and belief, is a resident of Orange County, California. He is the President, Chief Executive Officer, and Chairman of the Board of Directors of Powerski.

## Facts Common to All Counts

8.  In its marketing materials presented to potential investors, including the Plaintiffs, Powerski represented that its "primary objective" is to "manufacture, develop, market, and distribute its patented PowerSki Jetboard, along with associated technology including its patented SuperTorque XT engine." Defendants have made repeated announcements since at least 2000 that Powerski was poised to commence production of a unique and innovative product, but not a single production jetboard has been produced. Instead, Defendants' extensive marketing efforts are and have been intended solely to generate money for Defendant Montgomery to support his lavish lifestyle. Defendants have received millions of dollars from investors they duped with their false promises.

9.  In August of 2003, Mike Hainsworth was approached with an opportunity to

invest in shares of Powerski stock, which Defendants were offering in a private placement. Powerski was offering approximately 415,000 shares of common stock, at $12 a share.

10. Mike Hainsworth worked in the securities industry and therefore understood that there were certain increased risks involved with purchases of unregistered securities such as those Powerski was offering. He therefore conducted a careful investigation into Powerski's business plan and prospects before deciding to purchase shares for himself and his wife, Terrie Hainsworth. His investigation included multiple discussions with Defendant Montgomery in which Montgomery represented that Powerski would be bringing a product to market within a few months. The representations took several forms and Plaintiffs relied on them in deciding to purchase Powerski shares.

11. First, the offering memorandum itself discussed a "clear exit strategy for investors seeking liquidity," and stated that the "uniqueness of [Powerski's] highly recognizable products and name in the recreational marine industry make Powerski an ideal candidate for merger with, or acquisition by, a larger company." Plaintiffs reasonably understood these words to mean that Powerski had a product to sell and had established name recognition in the recreational marine industry. In fact, Powerski was not close to producing a product and investors had no hope of recouping their investment.

12. Prior to Plaintiffs' purchase, Defendants also had made numerous false public announcements to create the impression that production was imminent. Some examples follow:

   a. On September 19, 2002, Powerski sent a mass e-mail to shareholders and dealers announcing "the complete assembly of the first production Powerski Jetboard." The announcement continued:

3

> [Powerski] has casted 200 production engines and is ready [to] launch this exciting new watercraft to the world. After successfully testing the new production hull design, [Powerski] will be ready to launch the first production beta boards overseas to international distributors and shortly thereafter, after U.S. Coast Guard approval, to the domestic dealers in the USA. . . . This is a monumental time as we deliver the first Powerski Jetboards to dealers and distributors.

The e-mail also announced the opening of multiple dealerships around the United States and the world.

   b. On October 10, 2002, Powerski announced, "the testing of the first production beta Powerski Jetboards. In the last three months the 330cc Powerski SuperTorqueXT engines have been watertested in the prototype hull style and now in the new production hull. . . . [Powerski] has casted over 200 production engines and is machining and assembling engines and Powerski Jetboards." Powerski also announced the opening of additional dealerships.

   c. On May 22, 2003, Powerski announced that it received written notification that "as of today we are able to sell and ride the Powerski Jetboard in the United States."

   d. In a July 3, 2003 press release, Powerski announced that it signed a "mass production manufacturing agreement" with a composites manufacturing company for "approximately 120-150 production hulls per month with the opportunity to double production by implementing additional workforces." The press release quoted Defendant Montgomery, who stated, "This whole process will move us from low rate production to a high rate production lowering cost! . . . This extreme cooperation is helping PowerSki International move into mass production just in time."

  13. Plaintiffs also relied on a lengthy "Executive Summary" the Defendants provided.

The Executive Summary contained numerous false representations that jetboard production was about to begin. The representations included the following:

    a.    "[Powerski] is now finalizing the die cast tooling development to reduce cost to realistic production levels." This statement is demonstrably false, as Powerski recently announced in similar fashion on March 30, 2005 that "high rate" die cast tooling was in place and Powerski was "poised for mass production."

    b.    The executive summary described the jetboard as "production ready."

    c.    "The Powerski Jetboard enters production with more than 300 dealer inquiries and more than 500 international distributor inquiries. Dealers are coming on board with investments and the purchase of production boards."

    d.    "As of February 1, 2003, [Powerski] has awarded 30 international dealerships to: . . . All of these entities have become [Powerski] shareholders as well as licensed resellers. Our distributors have been taking delivery of beta Jetboards to test and use in marketing promotion."

    e.    "[Powerski] is ready to release the Igniter 2000 into all worldwide markets except California. The product has been beta tested and the design is deemed ready to lock down for the initial production model."

14.    As a result of Mike Hainsworth's interest and efforts in advancing and promoting the Powerski product, and as an additional inducement to Mike Hainsworth to make a substantial investment in Powerski stock, Defendant Montgomery offered him employment with Powerski as Eastern Regional Sales Manager and Vice President of Investor Relations. The detailed and potentially lucrative offer to share in prospective profits further falsely conveyed the impression

that mass production was imminent.

15. Defendant Montgomery further enticed the Plaintiffs by representing that early investors in the company would be rewarded by a stock split which Defendant Montgomery stated would occur over the next few months. He provided Mike Hainsworth with a copy of a purported November 27, 2000 resolution of the Powerski board of directors authorizing the stock split. The resolution stated that "Mr. Montgomery further indicated that based on discussions with corporate counsel, that the Company would move as quickly as possible to file all of the necessary paperwork required in order to perform a stock split, . . . ." In addition, the memorandum accompanying the subscription agreement reflected that at an annual meeting held on December 22, 2000, the Powerski shareholders voted in favor of a 4-to-1 forward stock split. To date, Powerski stock has not split, and Defendants never intended to effectuate the split. Plaintiffs relied on these representations as well in deciding to purchase Powerski stock.

16. To help cover his lies, Defendant Montgomery employed a hypocritical and cynical faith-based marketing approach to appeal to investors like the Plaintiffs in an effort to falsely portray himself as an honest and ethical businessman. For example:

    a. When pitching his company, Defendant Montgomery told Mike Hainsworth, "This is a God given dream. God put me here to bring the Jetboard to the masses;" and "Money has never been my god. I just want to keep people wet and put a smile on their faces;" and "I thank God for every day of my life. He has provided me a way to have an income and fun in the sun too."

    b. Defendant Montgomery and Powerski used the Christian fish symbol in marketing materials, including placing the symbol in the "o" of Powerski. Defendant

Montgomery told Mike Hainsworth that this was his way of "witnessing to the godless."

17.    In reliance on the above-described misrepresentations, and others, in or about September, 2003, Plaintiffs purchased 35,000 shares of Powerski stock for $210,000.00. In November, 2003, Plaintiffs purchased an additional 833 shares of Powerski stock for $5,000.00. In total, Plaintiffs have invested $215,000.00 in Powerski and presently own 35,833 shares of Powerski stock.

18.    It was not until nearly a year after Mike Hainsworth purchased Powerski shares and began working for Powerski that he began to realize that he had been deceived. During this time, he witnessed Defendant Montgomery raise large sums of money via videos, web page announcements and boat shows coupled with pronouncements to the effect that production was "just around the corner." At the same time, virtually no progress was being made on actually bringing a jetboard to market. In addition, Mike Hainsworth witnessed a pattern whereby the Defendants announced a supposed major milestone agreement with a manufacturer, which had the effect of attracting investors, only to have Defendant Montgomery later quietly sabotage or withdraw from the deal. This pattern repeated itself on several occasions and continues to the present date.

19.    Also, despite the titles Defendant Montgomery conferred on him, Mike Hainsworth found that he had no managerial control or participation with respect to management decisions of Powerski. Throughout the latter parts of 2004, Mike Hainsworth continually questioned Defendant Montgomery as to when production would commence and demanded to know when the stock split would occur. In response, Defendant Montgomery continued to falsely assure him that he had imminent alternative plans to commence production and that the

stock split would occur immediately thereafter.

20. To date, Defendants have continued to announce various "milestones," to maintain the false impression that production is imminent, but Powerski still has not started mass production of any product, has never split its stock, and has continued to obtain substantial investment money from private investors.

21. Plaintiffs hereby offer to return to Defendant Powerski all shares of Powerski stock issued to them in order to restore the parties to the status quo.

22. All conditions precedent to the maintenance of this action, if any, have been met or excused.

### Count I
### Violation of § 10(b) of the Exchange Act and Rule 10b-5, Against All Defendants

23. Plaintiffs reallege and incorporate by reference paragraphs 1 through 22.

24. This claim is asserted against all Defendants and is based upon section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) and Rule 10b-5, promulgated thereunder.

25. Defendants, individually and in concert, made the statements described above in connection with the sale of Powerski stock.

26. These statements were materially false and misleading in violation of section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The statements were materially false and misleading, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

27. Defendants had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff, or, in the alternative,

acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them to Plaintiff.

28. Plaintiffs relied on the statements set forth above in making the investment decision to purchase shares of Powerski stock.

29. Had Plaintiffs known of the materially adverse information which was not disclosed by Defendants, they would not have purchased Powerski stock at all, or they would not have purchased at the price at which they purchased the shares, and they would not have sustained damages.

30. As a result of the Defendants' false representations, Plaintiffs have sustained a total loss of all amounts invested in Powerski, as the shares issued to them were valueless at the time of issuance, and had the representations been true, Plaintiffs would not have sustained this loss as the shares would have had some value.

## Count II
## Violation of Section 20(A)
## of the Securities Exchange Act Against Defendant Montgomery

31. Plaintiffs reallege and incorporates by reference paragraphs 1 through 22.

32. Defendant Montgomery, by virtue of his substantial role in the transactions discussed above, was a controlling person of Powerski within the meaning of Section 20(a) of the Securities Exchange Act.

33. Defendant Montgomery's position made him privy to, and provided him with actual knowledge of the material facts concealed from Plaintiffs.

34. Defendant Montgomery had the power and influence, and exercised the same, to cause Powerski to engage in the unlawful conduct and practices complained of herein by causing

Powerski to disseminate the false and misleading information referenced to above. Defendant Montgomery actively participated in the illegal activity described herein.

35. By virtue of the foregoing, Defendant Montgomery violated Section 20(a) of the Securities Exchange Act.

36. By virtue of the conduct alleged above, Defendant Montgomery is liable to the Plaintiffs for the substantial damages they suffered in connection with their purchase of Powerski stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief as follows:

1. monetary damages in excess of $75,000.00, restitution, and disgorgement;

2. rescission;

3. expenses, and costs of this action; and

3. such further relief as this Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 27th day of April, 2005.

_____
WILLIAM J. COOK, ESQUIRE
TRIAL COUNSEL
Florida Bar No. 986194
Barker, Rodems & Cook, P.A.
300 West Platt Street, Suite 150
Tampa, Florida 33606
813/489-1001 (telephone)
813/489-1008 (facsimile)
Attorneys for the Plaintiffs